# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

LEON ROBINS,       )

      )

    Petitioner,       )      NO. 3:07-0429

      )      JUDGE HAYNES

v.       )

      )

JAMES FORTNER, Warden,       )

      )

    Respondent.       )

## M E M O R A N D U M

Petitioner, Leon Robins, filed this action under 28 U.S.C. § 2254 seeking the writ of

habeas corpus to set aside his state conviction of first degree murder for which he received a life

sentence with the possibility of parole. In his pro se petition, Petitioner asserted numerous

claims[1] and after a review of the petition, the Court appointed the Federal Public Defender to

represent Petitioner and an amended petition was filed. The amended petition presents the

following claims under the Fifth, Sixth and Fourteenth Amendments to the United States

Constitution: (1) ineffective assistance of his trial counsel for his alleged failures to investigate

---

[1] The claims in the pro se petition were as follows: (1) actual innocence; (2) the State's conspiracy to convict the petitioner; (3) prosecutorial misconduct; (4) ineffective assistance of counsel; (5) judicial misconduct/abuse of discretion; (6) illegally seized/false arrest; (7) unlawful search/illegally seized personal property; (8) excessive bail; (9) cruel and unusual punishment; (10) denied the right to subpoena witnesses and present evidence; (11) speedy trial; (12) denied the right to call witnesses; (13) denied expert assistance; (14) ineffective assistance of counsel; (15) the right to have the jury presented with all the facts; (16) denied the right to a fair trial based on a conspiracy by the prosecutor; defense counsel and judge; (17) denied the right to present a defense; (18) insufficiency of evidence; (19) due process; (20) ineffective assistance of counsel at the motion for new trial and on appeal; and (21) denied the right to petition the government for the redress of grievances. The Federal Rules of Civil Procedure can apply in a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ. P. 15(a), the filing of an amended complaint supercedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended petition to supercede the pro se petition. The amended petition adopts and incorporates by reference the claims in the original pro se petition filed in this action, but does not brief or present argument on all of those claims. Those claims that are not briefed are deemed waived. See United States v. Sandridge, 385 F.3d 1032, 1035 (6th Cir. 2004) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). A party who has counsel cannot file separate papers, United States v. Howton, 229 Fed. Appx. 362, 370 (6th Cir. 2005), including in habeas actions. Keenan v. Bagley, No. 1:01CV2339, at *1 (N.D. Ohio 2010); Adams v. Schwartz, No. CIV S-05-2237 RRB JFM P, 2008 WL 217514, at *1 (E.D. Cal. 2008). Thus, the Court considers only claims briefed in the amended petition filed by his counsel.

1

Petitioner's defense, to present witnesses, to preserve issues for appeal, to present evidence of the State's investigator's misconduct, to advise adequately Petitioner of his right to testify, and to file pretrial motions on the special treatment of prosecution witnesses; (2) that Petitioner's Fifth Amendment right to testify was violated due to his counsel's and the trial court's lack of advice on his right to testify; and (3) that the state trial court improperly instructed the jury on Petitioner's alibi defense.

## A. Procedural History

Petitioner was charged with the shooting and killing of Eugene Simmons, also known as Michael Roach, in Nashville, Tennessee on February 29, 2000. The jury convicted Petitioner of first degree murder, but acquitted him of especially aggravated kidnapping. After denial of his motion for new trial, Petitioner appealed to the Tennessee Court of Criminal Appeals that affirmed his conviction and sentence. State v. Robins, No. M2001-0182-CCA-R3-CD, 2003 WL 1386835 (Tenn. Crim. App. October 13, 2003). The Tennessee Supreme Court denied Petitioner's application for permission to appeal on October 13, 2003. Id.

Petitioner then filed a state post conviction proceeding and after an evidentiary hearing, the state trial court denied the post-conviction petition. On appeal, the Tennessee Court of Criminal Appeals affirmed the trial court's order denying the petition. Robins v. State, No. M2005-01204-CCA-R3-PC, 2006 WL 1816361 (Tenn. Ct. Crim. App. June 27, 2006). The Tennessee Supreme Court denied Petitioner's application for appeal on October 30, 2006.

2

## B. Review of the State Record

On Petitioner's direct appeal, the Tennessee Court of Criminal Appeals made extensive

findings of fact[2] underlying Petitioner's conviction:

> Around 10:00 p.m. on February 29, 2000, Lyntasha Simmons was inside her
> apartment at Nashville's Parkway Terrace Apartments when she heard gunshots
> outside. She looked out her door and saw a person lying on the ground. She had
> just telephoned the police when an onlooker informed her that it was her brother,
> Eugene Simmons, also known as Michael Roach, who had been shot. Simmons
> dropped the phone, ran to her brother's side, and waited for the police to arrive.
> The victim was transported by ambulance to Vanderbilt Hospital where he died
> the next day. Metro Nashville Police Officer Terrence Graves testified that, at
> 10:08 p.m., he received a dispatch regarding a shooting at that location. He
> arrived within a minute, saw that the victim had suffered gunshot wounds, and
> secured the scene.
>
> Amelia Patterson testified that she, along with Pamela Johnson, Tara Johnson, and
> their cousin, Gerald Johnson, was standing on the porch outside of Pamela's
> apartment on the night of the shooting. Pamela was on her cell phone talking to a
> person she referred to as "Tab" when she, referring to the victim, said, "[H]ere he
> go right here." Pamela told Gerald to bring the victim to her porch. Gerald
> approached the victim, who was walking just a few feet away, and "kind of like
> shook him up and brought him over to the porch." The victim "was refusing, but
> he finally came over there," and Pamela put him on the phone to speak with Tab,
> who wanted to "talk to him about her money." Patterson testified, "All I heard
> him say was that he was going to give her her money at 11:30." Patterson said the
> conversation ended, and "I guess they had told her that they was on their way.
> They was on the Interstate and she had hung up." Pamela informed her that their
> discussion concerned "ten-dollars ($10.00) worth of white," meaning cocaine.
>
> The victim proceeded to walk away when Pamela again instructed Gerald to bring
> him back to the porch. The victim protested, explaining that he had to go heat up
> the bag of food that he was carrying. Pamela responded that he could heat it up at
> her house and, apparently accepting this offer, he began walking toward her
> porch. Patterson testified that the victim "didn't make it on the porch," however.
> At this moment, Tab, accompanied by a man, emerged from the parking area and
> asked, "where her mother-fucking money was." The victim was never given the
> opportunity to respond to Tab's demand as the man, who was approximately five
> or six feet away from the victim, pulled a gun from his pocket and shot him. From
> the witness stand, Patterson identified Tab as the defendant Tabatha White and

---

[2] State appellate court opinion findings can constitute factual findings in a habeas action, Sumner
v. Mata, 449 U.S. 539, 546-47 (1981), and have a statutory presumption of correctness. 28
U.S.C. § 2254(e).

3

the gunman as the defendant Leon Robins. Patterson testified that the police attempted to question Pamela Johnson the night of the shooting, but she "wasn't really cooperating" and was "acting like she was hallucinating."

Tara Johnson testified that, in the days preceding the murder, Tabatha White asked her to keep on the lookout for the victim because she had given him "ten-dollars ($10.00) to do something for her." She remembered Pamela Johnson talking to White on her cell phone on the night of the shooting and informing her that the victim was present. She testified that Pamela told Gerald Johnson to bring the victim to her, which he did. The victim spoke with White on the telephone and told her that he would pay her at 11:30. As the victim attempted to leave, Gerald forced him to stay, and Pamela told him to heat his food at her house. Before the victim could enter the house, Tabatha White and a man approached. White said "she wanted her mother-fucking money," and the "dude" shot the victim. Tara heard three gunshots fired and ran into the house. She testified that she did not see either person's face, but recognized the voice as that of Tabatha White, even though she "didn't really know [her] that much."

Pamela Johnson testified that the defendants were at her house "[e]ither one or two days before" the shooting, and Tabatha White gave the victim ten dollars to procure drugs. Although she had known White "[f]or about two or three years," it was her first encounter with Leon Robins. When the victim failed to return with either the drugs or the money, White was "mad" and instructed Johnson to be on the lookout for him. On the night of February 29, Johnson, standing in her doorway, spotted the victim and called White on a cell phone. Johnson then called the victim over and put him on the phone with White. The phone cut off and the victim proceeded to leave. She called White back and had her cousin, Gerald Johnson, bring the victim back to the front of her house. Moments later, Robins shot the victim and White said "something to him about her money." Johnson testified that she thought the defendants were "just going to beat him up or something."

Detective Danny Satterfield of the Metro Police Department testified that, before trial, Pamela Johnson had told him that she was inside her house when the shooting occurred and could not identify the shooter. At Tabatha White's bond hearing, Johnson again stated that she did not witness the shooting and denied making phone calls to White prior to the shooting.

Saying that she had been scared, Pamela Johnson admitted to lying to the police on the night of the shooting by telling them both that she did not know who shot the victim and that Tabatha White had not been there, as well as lying at White's bond hearing. According to Johnson, White had called her and said "just keep the cool and ... everything will be all right." At some point, however, Johnson changed her story and identified both defendants from photographic lineups, explaining that she "just had to tell the truth" and her "kids don't need to be having a momma that is getting in trouble for something she didn't do." On cross-

4

examination, it was elicited from Johnson that the police "coerced" her regarding her testimony. However, neither the details of the alleged coercion, nor its alleged effect, was revealed.

Detective Satterfield testified that, during his investigation, he spoke with Amelia Patterson who told him that "she was there and witnessed the shooting incident." On March 9, 2000, he showed her a photographic lineup of suspects from which she identified Robins without any uncertainty as the man who shot the victim. From another photographic lineup, she identified Tabatha White as the woman who was with Robins. That same day, Detective Satterfield spoke with Tara Johnson, who also witnessed the shooting, and showed her identical photographic lineups.

Because of the extensive questioning of Tara Johnson's selections from the male and female photographic lineups, we will set out the details of this matter. The record on appeal includes a copy of each, that of the females depicting Tabatha White as photograph number 4 and that of the males depicting Leon Robins as photograph number 6. On the form that corresponds to the male lineup, she identified "Picture No. 4, White, Tabatha" as "somebody she knew," explaining, "This is Tab. Don't know if Tab was there." However, she made no marks on the form corresponding to the female lineup. Thus, the form that was filled out for the male lineup actually refers to the female lineup, and no form was filled out by the witness corresponding to the male lineup.

Victoria Shelton, who lived in the apartment complex where the shooting occurred, testified that, on that night, she was inside her house and overheard Gerald Johnson tell the victim "that he was going to give him something." When the victim explained that he would pay him later that night, Gerald Johnson "kept saying no." "A few seconds, a couple of minutes" later, she heard four gunshots, went outside, and saw the victim on the ground. She saw a white Chevrolet Cavalier leave the parking lot, and she said that a "light-skinned male black" usually drove that particular car.

Harold Overton testified that he lived in Apartment U-166 at the Knollcrest Apartments. On March 3, 2000, Detective Clifford Mann, responding to an anonymous CrimeStoppers tip, visited Overton to question him about Tabatha White, who lived in nearby apartment U-162. He told Detective Mann that he was familiar with White and her occasional visitor, Leon Robins, whom he identified from a photographic lineup. A few nights earlier, according to his testimony, he witnessed Robins engaging in the following conversation:

There was [sic] about three or four guys that were talking, and then one guy walked up and he said Leon, man, ... they are looking for you .... And then he said, like, well, I don't give a fuck, you know, there is more than one Leon ... and then he said besides that, they don't know my last name[.]

On cross-examination, Overton testified that he was fifteen to twenty feet away from the conversation and that, although it was dark, the area was well lit by a streetlight.

Dr. Bruce Levy, the Davidson County Medical Examiner, testified that the victim was shot twice. One bullet entered the middle of the forehead and the other entered the back of the left thigh. As to the head wound, Dr. Levy concluded that the barrel of the gun was greater than two feet away when fired. Based on toxicology tests, he testified that the victim was under the influence of cocaine at the time of the incident.

Cody Sims, customer operations manager for Cricket Communications, a cellular telephone company, testified that Pamela Johnson was a customer on February 29, 2000, and that her cell phone number was 615-485-5158. Laurie Turner, a legal affairs coordinator for Powertel, another cellular telephone company, testified that, according to company records, Tabatha White was a customer on February 29, 2000, and, on that day, three consecutive incoming calls were received on her cell phone from Pamela Johnson's 615-485-5158 phone number. The respective times for those three calls were 9:52, 9:53, and 9:58 p.m.

Marion Tucker testified on behalf of Leon Robins that, on the night of February 29, he, apparently, was a witness to the confrontation with the victim, saying, "I seen this female come up [and] assault [the victim] over ten-dollars ($10.00), and I turned around and ran, and that is all I seen." He stated that the woman who said "Where my ten dollars at?" was holding a gun.

Robins' sister, Nicole House, testified that she was with him at their mother's house on the night of the shooting and, when she left "[b]etween 10:15 and 10:30," he was still there. On cross-examination, she testified that, although she had learned at the preliminary hearing the time and date of the murder for which her brother had been charged, she did not inform the police that she had been with him at the time of the killing. Martinique Robins, another sister of the defendant, also testified that, on the night of the murder, he still was at their mother's house when she departed, sometime "close to 10:30." Like her sister, she did not contact the police about her brother's whereabouts on the night and time of the shooting. Robins' mother, JoAnn Hardy, testified that her son was at home when she returned from work shortly after 11:00 p.m. on the night of the shooting.

Tabatha White's mother, Raven White, testified that her daughter was with her at her house at the time of the shooting. On cross-examination, she admitted that at her daughter's bond hearing, she stated that she went to bed around 9:00 p.m. on the night of the shooting. White's father, James White, testified that he usually goes to bed at "7:30 or 8:00" and that, on the night of the shooting, his daughter "was there when I went to bed. She was there when I got up. Other than that, I can't tell you nothing." But, he testified, if she were to have left while he was

asleep, the dogs would have awakened "everybody just about in the neighborhood."

Robins, 2003 WL 1386835 at **1-4. The appellate court's other factual findings are set forth in the context of Petitioner's specific claim.

### C.  Conclusions of Law

Actions under 28 U.S.C. § 2254 are governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  In such instances, the Supreme Court held that a federal habeas court may grant a writ.  Id. at 413.  The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "the holdings as opposed to the dicta" of its decisions at the time of the state court decision.  Id. at 412.  Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time [the Petitioner's] state-court conviction became final."  Id. at 390; accord Joshua v. DeWitt,

7

341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that the AEDPA modified the court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. "Even if a federal court could determine that a state court incorrectly applied federal law, the court still could not grant relief unless it also finds that the state court ruling was unreasonable." Cristini v. McKee, 526 F.3d 888, 897 (6th Cir. 2008). The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

For habeas relief, all federal law claims must be fairly and properly presented to the state courts. Picard v. Connor, 404 U.S. 270, 275 (1971). A claim supported only by citation to state law is insufficient to present a federal claim, even if the cited state decision restated an analysis of federal law. Anderson v. Harless, 459 U.S. 4, 7 n.3 (1982) (per curiam). As to how the facts and federal legal theory must have been "fairly presented" to the state courts, in Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam) (citing Picard and Anderson), the Supreme Court stated: "If state courts are to be given the opportunity to correct alleged violations of prisoners, federal rights, they must surely be alerted to the facts that the prisoner are asserting

8

claims under the United States Constitution." Id. Duncan modified and heightened the Picard standard. Id. at 367. (Stevens J., dissenting)

If a properly presented federal law claim is not adjudicated in the state courts, the AEDPA is inapplicable. Maples v. Stegall, 340 F.3d 433, 436 (6th Cir. 2003). In such instances, the Court "'reviews questions of law and mixed questions of law and fact de novo.'" Id. (citations omitted). If a state court decides a federal law claim, but "does not squarely address the federal constitutional issue in question, but its analysis bears 'some similarity' to the requisite constitutional analysis, we must carefully review both the record and the applicable law, and may reverse only if we conclude that the State recent decision is contrary to or an unreasonable application of federal law." Filiaggi v. Bagley, 445 F.3d 851, 854 (6th Cir. 2006) (quoting Maldonado v. Wilson, 416 F.3d 470, 476 (6th Cir. 2005). In any event, this modified AEDPA standard "[n]onetheless bars the court from reversing unless the state's court's decision is contrary to or an unreasonable application of federal law.'" Maldonado, 416 F.3d at 476.

In reaching this decision, the Supreme Court reiterated that the claims were to be decided on the record before the state court:

> In this and related contexts we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it. See Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason,

325 F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

## 1.   Ineffective Assistance of Counsel Claims

The specifics of Petitioner's claims of ineffective assistance of his trial counsel claim are for counsel's alleged failures: to investigate Petitioner's defense, to present witnesses, to preserve issues for appeal, to present evidence of the State's investigator's misconduct, to advise adequately Petitioner of his right to testify, and to file pretrial motions on the special treatment of prosecution witnesses. These specifics can be readily grouped into the pretrial and trial performance of Petitioner's counsel.

### a.   Petitioner's Pretrial Claims

The first group of pretrial claims were addressed in Petitioner's state post conviction appeal where "petitioner contend[ed] that his attorney's performance was constitutionally deficient because his attorney failed to investigate his case properly . . . Petitioner's claims that although his attorney hired a private investigator, the attorney did not follow up on the information uncovered by the investigator… The petitioner contends his attorney's performance was constitutionally deficient for failing to consult with him adequately." Robins, 2006 WL 1816361 at *13.

> The petitioner testified that his attorney never discussed a line of defense with him before the trial. He said, "That's one reason I filed a complaint with the Board of Professional Responsibility ...."  The petitioner said he wanted his attorney to file a motion to suppress the line-up identification procedures because he was "the biggest person on the photo line-up. You know, I st[u]ck out above any other dark-skinned or black male." The petitioner said that although his attorney argued a motion to suppress the line-up on the day of trial, the attorney did not raise that issue.

Id. at *9.

10

The Tennessee Court of Criminal Appeals's factual findings on these pretrial claims were as follows:

> At the post-conviction hearing, the petitioner's trial attorney testified that he was appointed to represent the petitioner. The attorney said he hired a private investigator to help him prepare the petitioner's defense. He said the investigation revealed that the police initially considered someone named "Twenty" as a suspect in the murder. He said his defense strategy at the trial was that the petitioner had an alibi. He said he also introduced testimony at the trial from a witness who said the petitioner's co-defendant shot the victim. The attorney said he met with the petitioner to discuss the case ten times before the trial. The attorney acknowledged that the petitioner's co-defendant, Pamela Johnson, testified against the petitioner. He said he could not remember, though, whether he filed a motion demanding to know if the state had an agreement with Ms. Johnson in exchange for her testimony.

> The attorney testified that he filed a motion to suppress the petitioner's identification based upon improper procedures used during the photograph line-up. He said he recalled arguing about the issue of hair length as it related to the line-up.

> \* \* \*

> The attorney testified that the petitioner's name was originally brought to the attention of the police based upon an anonymous 9-1-1 call. He said, however, that he failed to attempt to discover the identity of the caller.

> The attorney testified that he filed an amended notice of alibi which included the names of four witnesses. He acknowledged that one of the witnesses was Ms. Christine McHenry. He admitted that he had subpoenaed Ms. McHenry to testify at the trial but said that she was ill on the day of the trial and was not available. He said he intended to call Ms. McHenry because she was the petitioner's grandmother, "and I think she was living in the house and would have supported the alibi defense."

> On cross-examination, the petitioner's attorney admitted that no discovery documents existed stating that "Twenty" committed the murder. Rather, he said the documents reflected that "Twenty" was someone who could have been involved. The petitioner's attorney acknowledged that he concentrated his investigative resources on finding people to establish the petitioner's alibi.

> On redirect examination, the petitioner's attorney admitted that the discovery file contained the name of Antonio Williams who reportedly stated that a female shot the victim. The attorney admitted he did not call or attempt to subpoena Mr. Williams as a witness at the trial.

11

Roger Clemons testified that he was the private investigator hired by the petitioner's attorney. Mr. Clemons said that after his investigation was complete, he provided the petitioner's attorney with the information that he collected. He said that he located a person with the street name of "Twenty" and that the person's actual name was Kenneth Frazier Taylor. Mr. Clemons said he interviewed Mr. Taylor who admitted he was also known as "Twenty." He said "Twenty" initially denied knowing the petitioner but later admitted that he had fathered a child with the petitioner's sister, Nicole House. Mr. Clemons said "Twenty" also admitted driving a white car during the time of the shooting. Mr. Clemons said he also interviewed Ms. House who said that "Twenty" was known in the community as an armed drug dealer who hung around the area of the shooting.

Mr. Clemons testified that the only alibi witness who was with the petitioner at his home the entire night was Ms. McHenry, a witness not called by the petitioner's attorney. Mr. Clemons said Ms. McHenry was not related to the petitioner but was only residing in the home during the time of the shooting. Mr. Clemons acknowledged serving a subpoena on Ms. McHenry for her to testify at the trial.

Mr. Clemons testified that as a part of his investigation, he learned that Detective Satterfield was coaching one of the trial witnesses, Amelia Patterson. Mr. Clemons said he interviewed the witnesses who overheard the coaching incident and provided the information to the petitioner's attorney.

Mr. Clemons testified that the length of the petitioner's hair was an issue in the case. He said the petitioner's mother told him that she had allowed the petitioner to move home before the shooting but only if he cut his hair and that the petitioner cut his hair and returned home. Mr. Clemons said this contrasted with the descriptions of the shooter's hair as long hair with a ponytail.

Mr. Clemons testified that he interviewed Amelia Patterson who told him the perpetrator had dark skin. Mr. Clemons said, however, that the petitioner was light-skinned because his mother was Caucasian. Mr. Clemons also said he was unable to link the petitioner with any cars white in color and matching the description given by the eyewitnesses. He said he provided this information to the petitioner's attorney.

\* \* \*

The petitioner testified that his attorney never discussed a line of defense with him before the trial. He said, "That's one reason I filed a complaint with the Board of Professional Responsibility ...." The petitioner said he wanted his attorney to file a motion to suppress the line-up identification procedures because he was "the biggest person on the photo line-up. You know, I st[u]ck out above any other dark-skinned or black male." The petitioner said that although his attorney argued

12

a motion to suppress the line-up on the day of trial, the attorney did not raise that issue.

Robins, 2006 WL 1816361 at **5, 6-7, 9.

After these factual findings , the Tennessee appellate court rejected those claims citing federal and state law.

### B.   Failure to Consult Adequately

He claims that his attorney's meeting with him ten times before the trial "is inadequate for any trial ...." The state does not respond to this contention.

At the post-conviction hearing, the petitioner failed to introduce any evidence as to how his attorney's meeting with him only ten times prejudiced his defense. We conclude the petitioner has failed to prove prejudice by clear and convincing evidence. The petitioner is not entitled to relief on this issue.

The post-conviction court stated that it ruled on and denied the petitioner's motion to suppress and that because the court ruled on all of the issues raised in the motion, no prejudice inured to the petitioner from his attorney's untimely filing. We conclude the petitioner has failed to show prejudice by clear and convincing evidence how his attorney's untimely filing prejudiced his defense. The petitioner is not entitled to relief on this issue.

\*   \*   \*

### D. Failure to File a Motion to Suppress the Identification Procedures

The petitioner contends his attorney's performance was constitutionally deficient for failing to file timely a pretrial motion to suppress the witness' identifying him by picking his picture out of a photograph array. He claims the photograph array was impermissibly suggestive but does not argue why that is so. He also claims that his attorney should have based his motion to suppress on Det. Satterfield's coaching Amelia Patterson. The state responds that the petitioner's trial attorney did file a motion to suppress the identification which the trial court heard and ruled on the day of the trial.

The post-conviction court stated that it ruled on and denied the petitioner's motion to suppress and that because the court ruled on all of the issues raised in the motion, no prejudice inured to the petitioner from his attorney's untimely filing. We conclude the petitioner has failed to prove by clear and convincing evidence that he was prejudiced as a result of his attorney's introducing the mug shots into evidence. Although the introduction of the nine mug shots allowed the jurors to consider that the petitioner had been previously arrested, the state had already

13

> introduced three mug shots which would have allowed the jurors to draw a similar conclusion. Moreover, various witnesses at the trial identified the petitioner as the shooter, and Ms. Johnson testified to the events leading up to the killing. The petitioner is not entitled to relief on this issue.

Robins, 2006 WL 1816361 at **14, 15. As discussed infra, the Tennessee appellate court considered Petitioner's failure to investigate claim in the context of the actual events at his trial.

To evaluate these claims, the Sixth Circuit summarized the Supreme Court's precedents governing legal principles on ineffective assistance of counsel claims. Mitchell v. Mason, 325 F.3d 732 (6th Cir. 2003). In Mitchell, the Sixth Circuit identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at the critical stage of the proceeding for which presumed prejudice arises; and (2) counsel whose performance was deficient on specific issues and was demonstrably prejudicial to the defendant. As that Court explained:

> In United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)... the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." Cronic, 466 U.S. at 659 n. 25. In other words, when counsel is totally absent during a critical stage of the proceedings, prejudice must be presumed. . . . In Williams, the Supreme Court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." Williams, 529 U.S. at 391 . . . (citing Strickland, 466 U.S. at 692, 104 S.Ct. 2052). We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel. Olden, 224 F.3d at 568 (prejudice is presumed when counsel is absent during prosecution's presentation of evidence that implicates defendant because such absence occurred during "critical stage" of trial).
>
> \*    \*    \*
>
> Within the first category are three types of presumptive ineffectiveness of counsel: The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic,

14

466 U.S. at 659, 104 S.Ct. 2039). The second is when counsel "'entirely fails to subject the prosecutions' case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

Id. at 740, 742. Here, Petitioner's claims fall within the second category.

To establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691 (emphasis added).

From the Tennessee appellate courts' findings and rejections of Petitioner's claims, the Court concludes that the state courts' rulings were reasonable on Petitioner's counsel's pretrial work. Petitioner's counsel hired an investigator to conduct relevant

15

inquiries, met with Petitioner ten times and actually filed a motion to suppress. Petitioner's counsel sought to find persons to substantiate Petitioner's alibi defense, subpoenaed Petitioner's grandmother to testify at Petitioner's trial and secured a witness who testified at trial that Petitioner's co-defendant shot the victim. In these circumstances, the state courts could reasonably conclude that Petitioner's claims about his counsel's pretrial work did not prejudice Petitioner to justify habeas relief.

## 2. Petitioners' Trial Claims

As to Petitioner's trial counsel's performance at trial, the Tennessee appellate court found as follows:

> The attorney testified that on the day of the trial, Judge Blackburn, who was scheduled to preside over the petitioner's trial, became ill and that Judge Kurtz presided over the case by interchange. The attorney said that he was not asked to approve of this arrangement, that the petitioner objected to it, but that the attorney failed to inform the court of the petitioner's objection because he thought "it was quite advantageous that Judge Kurtz was sitting."

> \* \* \*

> The attorney acknowledged that during the trial, he did not ask any of the witnesses about "Twenty's" reputation for violence. He said he also did not ask whether "Twenty" "met the description of the shooter."

> The attorney testified that he did not object at the trial on the grounds of inadmissible hearsay to the testimony of Harold Overton. The attorney admitted failing to object during closing arguments to the state's mischaracterization of Mr. Overton's testimony.

> The attorney testified that the petitioner filed a complaint against him with the Board of Professional Responsibility. He said, however, that he did not bring this filing to the court's attention.

> The attorney testified that his investigation revealed that Detective Mann threatened to take away the children of the petitioner's co-defendant, Pamela Johnson, if she did not cooperate with the police and testify against the petitioner. He acknowledged, however, that he did not cross-examine Pamela Johnson regarding Det. Mann's threat.

16

The attorney testified that after the state introduced photographs into evidence showing the petitioner with long hair consistent with witness testimony about the shooter, he discussed with the petitioner the propriety of introducing into evidence some of the petitioner's prior mug shots showing the petitioner with short hair. The attorney said he advised the petitioner that introducing the photographs into evidence was not a good idea because it would indicate to the jury that the petitioner had a lengthy criminal record. He said, however, that the petitioner insisted on introducing the photographs depicting his short hair. The attorney admitted not asking the court for a limiting instruction on the introduction of the mug shots.

The petitioner's attorney testified that he discussed the petitioner's right to testify with him. He said he did not actually prepare the petitioner to testify because alibi was the main defense. Concerning the petitioner's alibi defense, the attorney testified that he did not object to the trial court's alibi jury instruction. The petitioner's attorney also testified that he did not request the trial court to give the jury a specific instruction of how it should weigh direct versus circumstantial evidence.

The petitioner's attorney testified that he represented the petitioner on appeal. He said he did not consult the petitioner regarding his appeal because his relationship with the petitioner had deteriorated to the point that the petitioner threatened him.

\* \* \*

The petitioner testified his attorney told him that the trial judge, Judge Blackburn, was sick and that they would either have to agree to a continuance or agree to Judge Kurtz sitting by interchange. The petitioner said he told his attorney that he wanted Judge Blackburn because she knew the case better than Judge Kurtz and that he would take a continuance. He said, however, that thirty minutes later he was taken to the courtroom and the trial began.

The petitioner testified that his attorney never discussed with him the advantages and disadvantages of his testifying at the trial. He said the attorney only told him that if he testified, the state would bring up his prior record. The petitioner said he would have testified at the trial if he had been given the opportunity. The petitioner said his attorney never discussed his appeal with him. He said that he wanted his attorney to raise the issue on appeal about the interchange of judges but that his attorney failed to do so.

\* \* \*

Petitioner complains that there was no excuse for trial counsel not presenting Christine McHenry ... as a further alibi witness. At trial, the mother and sister testified as to the petitioner's alibi, but Ms. McHenry was not called because she

17

was home sick. Her testimony at the post-conviction hearing was mostly redundant to the testimony of the mother and sister. Further, when Ms. McHenry testified, she was confused and forgetful, and the proof does not show that her testimony would have been any better at the trial.

An important State's witness at trial was Amelia Patterson. The petitioner contends that trial counsel had witnesses who could testify that prior to the preliminary hearing, Detective Satterfield was overheard telling Ms. Patterson whom to identify as the shooter. Ms. Patterson was not called to testify at the post-conviction hearing, and Detective Satterfield denied that the incident ever occurred.

Petitioner contends that the cross-examination of the severed co-defendant, Pamela Johnson, should have been more vigorous. Petitioner contends that it should have been emphasized that Ms. Johnson faced a possible life sentence. The cross-examination could have been more explicit; however, the jury knew that Ms. Johnson was charged in the same indictment and that the charges were still pending, and an appropriate jury instruction was given ....

The petitioner contends that his trial lawyer failed when he did not discover the State's "deal" with Ms. Johnson. The proof shows that there was not a "deal" between the State and Pamela Johnson....

Petitioner offered proof from his mother and sister that he had short hair at the time of the shooting. There was proof at trial regarding the issue of hair length, and this is discussed in the appellate decision. The eyewitnesses described [the petitioner], at the time of the shooting, as having long hair. Petitioner now wants to contend that trial counsel failed to offer the family members who provided the alibi defense on the issue of his hair length. The jury rejected the alibi defense, and this Court has no reason to believe that the hair length testimony from the same witnesses would not suffer the same fate....
The petitioner complains that the trial lawyer did not seek the identity of the informant who called Crime Stoppers. No proof was presented as to how this information could have helped the petitioner at trial.

Petitioner complains that he wanted the defense lawyer removed before trial and that this motion was denied. He says he then filed before trial a complaint with the Board of Professional Responsibility. He contends that since he filed the complaint before trial, trial counsel had a conflict. Trial counsel testified that he had no memory of a complaint being filed before or during the trial. The Court credits this testimony. However, even if a complaint was filed, a criminal defendant cannot effectuate the removal of appointed counsel by filing a complaint with the Board. The petitioner had no right to choose his own appointed counsel.

18

Petitioner complains that trial counsel did not object to the testimony of Harold Overton on hearsay grounds. The Court believes that the statements of the petitioner were admissible hearsay. See T.R.E. 803(1.2). The statement by the petitioner was ambiguous but could have been interpreted as indicating consciousness of guilt. It was relevant. T.R.E. 401.

Petitioner's trial attorney had a cogent explanation as to why he recommended to the petitioner that he not testify at trial.

\* \* \*

The petitioner testified that his trial lawyer had no strategy. This is just not true. The defense was alibi.

Trial counsel perhaps could have done a better job. There may be untied loose ends on the hair length and the alibi, but both issues were raised, witnesses testified, and the State's proof was put to "the crucible of meaningful adversarial testing." The petitioner even had a hired professional investigator. The petitioner did not have perfect counsel, but he had adequate counsel and received a fair trial.

2006 WL 1816361 at \*\*5, 6, 9, 10.

As to Petitioner's counsel's trial performance, the Tennessee appellate court

rejected them as meritless for lack of any showing of actual prejudice.

A. Failure to . . . Present Evidence

The petitioner contends that his attorney's performance was constitutionally deficient because his attorney failed to investigate his case properly and present crucial defense witnesses. He claims that although his attorney hired a private investigator, the attorney did not follow up on the information uncovered by the investigator. He claims that his attorney failed to call Christine McHenry, a crucial alibi witness, to testify at the trial even though he knew of her existence and potentially exculpatory testimony. He claims his attorney also failed to present evidence that "Twenty" was the shooter and that "Twenty," not the petitioner, drove a white car at the time of the shooting. Finally, the petitioner claims that his attorney failed to present evidence through witnesses who testified for the petitioner at the trial or through other means regarding the fact that the petitioner had short hair at the time of the offense, contrary to the eyewitness statements that the shooter's hair was long. The petitioner contends his attorney's failures prejudiced his defense.

The state claims the petitioner's attorney did not render deficient performance for failing to seek a continuance in order to have Christine McHenry testify because Ms. McHenry, as the trial court noted, was "confused and forgetful" and would

not have been a helpful witness at the trial. The state responds that nothing in the post-conviction record preponderates against the trial court's finding that the petitioner's attorney's performance was not deficient for failing to "pin the murder on 'Twenty.' " The state claims that the only witnesses who would have testified to the petitioner's hair length were his alibi witnesses. It argues that because the jury rejected their alibi testimony it would have equally rejected their testimony as to the petitioner's hair length.

At the post-conviction hearing, Ms. McHenry testified that had she been called, she would have testified that the petitioner was at home on the night of the murder. The trial court found that Ms. McHenry was dazed and confused and that her testimony at the trial would have been merely cumulative to that of the petitioner's mother and sisters. We conclude that the record does not preponderate against the trial court's finding that the petitioner failed to prove prejudice by clear and convincing evidence.

At the post-conviction hearing, the petitioner's attorney testified that he did not pursue the avenue of defense regarding "Twenty" more vigorously because he was focusing on presenting the petitioner's alibi as the main defense. We also note that the petitioner failed to present any evidence at the post-conviction hearing affirmatively linking "Twenty" to the murder and conclude that the petitioner has failed to prove prejudice by clear and convincing evidence.

Concerning the petitioner's hair length, the trial court found the petitioner failed to prove prejudice by clear and convincing evidence because of the fact that the petitioner's evidence concerning his hair would have come from his alibi witnesses, whose testimony the jury rejected. We conclude that the evidence supports the trial court's finding that the petitioner failed to prove prejudice. The petitioner is not entitled to relief on this issue.

*   *   *

C. Failure to Determine the Extent of Pamela Johnson's Deal with the State

The petitioner contends his attorney's performance was constitutionally deficient for failing to file a pre-trial motion to discover the extent of the agreement made by Pamela Johnson with the state in exchange for her testimony against the petitioner. The state responds that no deal existed between the state and Pamela Johnson.

At the post-conviction hearing, Assistant District Attorney General Brett Gunn testified that he prosecuted the petitioner and that he made no deal with Pamela Johnson before she testified against the petitioner. He said he only promised to take into consideration her testimony when proceeding with the state's case against her. The trial court determined no deal existed between the state and Pamela Johnson. We disagree and conclude that General Gunn's quid pro quo

20

operated as an effective agreement. However, we conclude the petitioner failed at the post-conviction hearing to show by clear and convincing evidence that the result of his trial would have changed but for his attorney's failure to discover this arrangement. The petitioner has failed to prove prejudice, and he is not entitled to relief on this issue.

\*   \*   \*

E. Agreement to Judge Kurtz's Sitting by Interchange

The petitioner contends his attorney's performance was constitutionally deficient for failing to follow the petitioner's instruction to seek a continuance until Judge Blackburn could return. The petitioner claims his attorney agreed to the interchange, notwithstanding his stated opposition to it. The state contends that the petitioner had no right to contest the interchange of judges.

At the post-conviction hearing, the petitioner failed to introduce any evidence showing how he was prejudiced by the judicial interchange. The petitioner is not entitled to relief on this issue.

\*   \*   \*

I. Failure to Cross-Examine Witnesses Effectively

The petitioner contends his attorney's performance was constitutionally deficient for failing to cross-examine Pamela Johnson and Amelia Patterson effectively. He claims his attorney failed to cross-examine Pamela Johnson regarding her motive to lie based upon the fact that she was also under indictment in the case and to cross-examine Amelia Patterson based upon Det. Satterfield's coaching her before her testimony at the preliminary hearing. The state responds that no deal existed between Pamela Johnson and the district attorney's office and that the petitioner was not prejudiced by his attorney's failure to explore Ms. Johnson's motive for lying. The state also contends the petitioner failed to prove Det. Satterfield coached Amelia Patterson.

Initially, we note that at the post-conviction hearing, the petitioner failed to call Amelia Patterson to testify and that Det. Satterfield testified that he did not coach Amelia Patterson. Therefore, we conclude the petitioner has failed to prove by clear and convincing evidence that Det. Satterfield coached Amelia Patterson, that his attorney's performance was deficient, or that he was prejudiced.

Concerning Pamela Johnson, we again conclude the petitioner has failed to show the necessary prejudice resulting from his attorney's failure to cross-examine Ms. Johnson concerning her arrangement with the state. Regarding her motive to lie, the trial court found that the petitioner's attorney's cross-examination on this point could have been more explicit, but it noted that the jury was aware that Ms.

21

Johnson was under indictment for the murder and that it gave an appropriate instruction to the jury about her credibility. We conclude the petitioner has failed to prove by clear and convincing evidence that he was prejudiced, and he is not entitled to relief on this issue.

\* \* \*

J. Improperly Admitted Mug Shots

The petitioner contends that his attorney's performance was constitutionally deficient for improperly admitting prior mug shots of the petitioner into evidence and for failing to request a curative instruction. He claims that although he directed the attorney to introduce the pictures in order to contest the witnesses identification of him, the decision whether to introduce such evidence is the exclusive prerogative of the attorney, not the defendant. He claims the pictures allowed the jury to infer he was a repeat offender, resulting in prejudice. The state fails to respond to this argument.

We note the trial court also failed to address this issue in its order dismissing the petition. The record reflects that during the trial the state introduced three mug shots of the petitioner into evidence to show he had worn his hair long in the past. In response, the petitioner's attorney sought to introduce nine other mug shots of the petitioner, showing the petitioner as wearing his hair short. A bench conference ensued, and the petitioner's attorney stated, "This is something my client has demanded that I submit into evidence." The trial court advised the attorney that he did not have to adhere to his client's desire if he thought it was not a good idea to introduce the mug shots. The attorney responded, "Well, it's a good idea."

\* \* \*

M. Failure to Introduce Detective Satterfield's Coaching a Witness

The petitioner contends his attorney's performance was constitutionally deficient for failing to raise at the trial the issue of Det. Satterfield's coaching of Amelia Patterson at the courthouse before the preliminary hearing. The state contends the petitioner failed to prove that Det. Satterfield coached Amelia Patterson.

We note that at the post-conviction hearing, the petitioner failed to call Amelia Patterson to testify and that Det. Satterfield testified that he did not coach Amelia Patterson. Therefore, we conclude the petitioner has failed to prove by clear and convincing evidence that Det. Satterfield coached Amelia Patterson, that his attorney's performance was deficient, or that he was prejudiced. The petitioner is not entitled to relief on this issue.

N. Failure to Advise Petitioner Properly of His Right to Testify

The petitioner contends his attorney's performance was constitutionally deficient for failing to advise him properly his right to testify. He claims that under State v. Momon, 18 S.W.3d 152 (Tenn. 1999), a criminal defendant must personally waive his right to testify after questioning by the trial court. The petitioner claims that his attorney violated the Momon requirements and that he is entitled to a new trial as a result. The state claims that the petitioner's attorney advised him of his right to testify and that even if he was not advised properly, any error would be harmless given that the petitioner's defense was alibi and he had three alibi witnesses.

*   *   *

The trial court accredited the testimony of the attorney over the petitioner and found that the attorney did discuss the petitioner's right to testify with him. We conclude the petitioner has failed to establish any constitutional violation, and he is not entitled to relief on this issue.

O. Failure to Object to an Improper Alibi Instruction

The petitioner contends his attorney's performance was constitutionally deficient for failing to object to the trial court's alibi instruction. The state fails to respond to this issue.

Initially, we note the trial court failed to address this issue in its order dismissing the petition. The record reflects that the trial court gave the following alibi instruction:

> The defendant has presented evidence of an alibi in this case. An alibi is defined as evidence which establishes the defendant was not present at the scene of the alleged crime when it [allegedly] occurred. If the defendant was not present when the crime was committed, he or she cannot be guilty. The burden is on the State to prove beyond a reasonable doubt that the defendant was at the scene of the crime when it was committed. If you find from your consideration of all the evidence that the State has failed to prove beyond a reasonable doubt that the defendant was at the scene of the crime when it was committed, you must find the defendant not guilty. The weight to be given alibi evidence is a question for the jury to decide considering all the facts and circumstances of the case.

(emphasis added). The petitioner cites Christian v. State, 555 S.W.2d 863 (Tenn. 1977), and claims that the trial court improperly commented on the weight of the evidence. In Christian, the trial court's alibi instruction concluded, "The law says that the defense of alibi should be received by the jury discreetly and cautiously because it is a defense that can be easily manufactured or fabricated." 555 S.W.2d at 864. Our supreme held that a trial court "should not disparage alibi evidence or

23

instruct the jury to treat it differently from evidence offered on other issues" or "instruct the jury as to any special method of weighing or receiving alibi evidence .... " Id. at 865. The petitioner claims the trial court violated Christian.

We disagree and conclude the petitioner has misapprehended Christian's applicability to his case. The trial court did not comment on the weight of the evidence in the present case. It merely informed the jury that it was the jury's exclusive prerogative to determine the weight. We conclude the petitioner's attorney was not deficient in failing to object. We also conclude the petitioner has failed to introduce any evidence of how this attorney's failure to object resulted in prejudice. The petitioner is not entitled to relief on this issue.

P. Failure to Request a Jury Instruction

The petitioner claims his attorney's performance was constitutionally deficient for failing to request a jury instruction "on direct and circumstantial evidence." The state responds that the petitioner's attorney's performance was not deficient.

We conclude that the petitioner failed to introduce any evidence at the post-conviction hearing as to how he was prejudiced by his attorney's failure to request a specific instruction "on direct and circumstantial evidence." The petitioner is not entitled to relief on this issue.

Q. Failure to Consult With Petitioner for Appeal

The petitioner contends his attorney's performance was constitutionally deficient for failing to consult with him properly regarding his appeal. He claims that his attorney failed to raise issues on appeal that he requested and that he was prejudiced as a result. The state does not respond to this issue.

Initially, we note the trial court did not address this issue in dismissing the petition. In any event, we note the petitioner's brief is devoid of what issues he requested the attorney to address on direct appeal. It is also devoid of any allegation of prejudice. However, at the post-conviction hearing, the petitioner testified that one issue he wanted his attorney to raise on appeal dealt with the judicial interchange.

At the post-conviction hearing, the petitioner presented no evidence as to how Judge Kurtz's sitting by interchange for Judge Blackburn prejudiced his defense. We conclude that the petitioner has failed to establish the necessary prejudice and that he is not entitled to relief on this issue.

..... We conclude the petitioner's attorney did not afford him the ineffective assistance of counsel based on any single alleged error or the cumulative effect thereof. The petitioner is not entitled to relief on this issue.

24

> **Davidson County Assistant District Attorney General Brett Gunn testified that he was assigned to prosecute the petitioner. He said that regarding the testimony of Pamela Johnson, he did not make a deal with Ms. Johnson in exchange for her testimony. He said he only told her that the district attorney's office would look at her case after the trial of the petitioner and Tabatha White. Mr. Gunn admitted that although Ms. Johnson was originally indicted for felony murder, she pled guilty to a lesser offense after the petitioner and Ms. White were convicted and was sentenced to four years on probation.**

2006 WL 1816369 at **13, 14, 15, 16, 17, 18, 19 20.

In light of its extensive findings and conclusions, the Court concludes that the state courts could reasonably conclude that whatever omissions of Petitioner's trial counsel that may have qualified as deficient, Petitioner has not shown any actual prejudice that the result of his trial was unfair or unreliable. The state courts' rulings on these trial related claims are not unreasonable.

### 3.    Petitioner's Fifth Amendment Claim

Petitioner's Fifth Amendment claim is that the trial court's and his trial counsel's failed to advise him of his right to testify at trial. Petitioner relies upon Rock v. Arkansas, 483 U.S. 44 (1987), but Rock does not require the trial court to voir dire a defendant on whether he understood his right to testify or not to testify.

Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time [the Petitioner's] state-court conviction became final." Williams, 529 U.S. at 390. Petitioner has failed to establish this right to a voir dire on his Fifth Amendment right was clearly established at the time of his trial.

In any event, Petitioner did not present this claim on direct appeal and under Tenn. Code Ann. § 40-30-106(g), the claim is deemed waived. Under the cited statute that "[a] ground for relief [in] in a post-conviction proceeding] is waived if the petitioner personally or through an

25

attorney failed to present it for determination in any proceeding before a court of competent jurisdiction," here, on appeal from the judgment of the trial court. Tenn. Code Ann. § 40-30-106(g). The Tennessee appellate court found this claim to be waived. Robins, 2006 WL 1816361 at *20. The Sixth Circuit has also found that the Tennessee waiver statute, Tenn. Code Ann. § 40-30-106(g), to be an independent and adequate state rule that is regularly enforced. Cone v. Bell, 243 F.3d 961, 969 (6th Cir. 2001), overruled on other grounds by Bell v. Cone, 535 U.S. 685 (2002)). Thus, this claim is procedurally defaulted and Petitioner has not made any challenge to excuse this default.

### 4.    Jury Instruction Claim

Petitioner's last claim is that the trial court's jury instruction on his alibi defense denied him due process of law. The trial court's actual charge was that the "weight to be given alibi evidence is a question for the jury to decide considering all the facts and circumstances of the case." (Docket Entry No. 51 at 25-26). For this claim, Petitioner relies upon Christian v. State, 555 S.W.2d 863 (Tenn. 1977), but Petitioner did not present this issue on direct appeal and this claim was also deemed to be waived under state law, Tenn. Code Ann. § 40-30-106(g), as the Tennessee Court of Criminal Appeals found. Robins, 2006 WL 1816369 at *21.

For these reasons, the Court concludes that the petition for the writ of habes corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___19th___ day of August, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge

26